# Barnes *against* Irvine.

(See page 497, *ante.*)

Huston J.—Dissenting.—It has been often said, that the title to lands ought to be certain, and of course that points decided respecting such titles should be considered settled and sacred.   Where such titles were acquired under legislative enactments, the party must comply with the requisitions of the law, or he acquired no title.   It seemed settled that no one could disregard the provisions of the law, and in their place substitute what he supposed to be equivalents; but nothwithstanding all this, in point of fact, the time of courts in England and in the United States, has been more occupied in discussing the titles to land, than on any other subject.   In England the difficulty has for a long time arisen on the construction of deeds and wills; and the difficulty would seem to be insurmountable, for not only has every deed generally, and every will certainly, different provisions, but every writer of deeds and wills has his own mode of conveying the idea, which it is his duty to express.   In this state, lands have been acquired from the proprietary by all the variety of conveyance—by deeds of lease and release—by patent without previous warrants, though more generally, the patent has been a confirmation of previous grants in the form of warrants, locations, or application; and in addition to all these, a right would be acquired, without any application to, or any knowledge of the proprietary or of the state, by an actual settlement and residence on lands for which the parties must take titles in the manner prescribed, at some future time.   Although under the proprietor, some forms of acquiring title, were always prescribed, yet the proprietor being sole owner, he could dispense with these forms and confirm titles acquired without strict regard to them, or even in direct opposition to them.   It has been, however, decided, in *Dall.* 345, 4, and so far as I know never, in terms, contradicted, that since the Revolution, the terms and conditions having been prescribed by the legislature, neither the governor nor officers of the land office, can alter them, or dispense with them.   I do not know that it has been expressly asserted that courts can do either; though in point of fact the same result has been produced by different courts, putting different constructions on the same law, or more correctly, by differing as to what parts of the law contained the essential requisites, to be performed by the person wishing to acquire title.   This has, more or less, been the case as to several of our land laws, but seems to be settled, as to all of them, except that part of the act of 1792, and its supplements, which relates to lands north and west of Ohio and Alle-

gheny rivers. The supreme court of this state in 1800, in the Commonwealth *v.* Tench Cox; and again, in 1802 the Attorney General *v.* The Grantees,see 4 *Dall.* 170,and *same book,* 247—settled the general construction of this act; and it is a little remarkable, that the warrantees themselves had understood the law as the supreme court did. It appears by the statement of the first case that the Holland company (and I may well add, the population company) understood that having been prevented by the Indian war, they, under the clause which gives title to those who persist after the war is ended, went on to expend vast sums of money, in order to commence and continue these settlements. So entirely were they convinced of this, that by the same statement, it appears they had given in all instances one-fourth and often one-third of each tract to the person who would set down on it and comply with the terms of the law in making the actual settlement as required. Their counsel admitted the position, that whatever was required by the act, must be done, and they contended only for an equitable construction. They admitted (though the judge who dissented did not) that the proviso in the ninth section applied to those who had warrants as well as those who had not; and it is remarkable that in the first case every person agreed that, if it had not been for the prevention by the war for two years from the date of the warrant,and if not prevented for two years after the war by an actual settler on the land holding them not by force, the title would not vest. "It is admitted on all hands," says Judge Yeates, who delivered the opinion of the court, "that the terms of actual settlement and residence, are, in the first place, precedent conditions to the vesting an absolute estate in those lands." Every part of that opinion is good law and good sense, and in all the discussions on this act, I have remarked, it is passed by, and not contested, because Judge Shippen dissented. It was a very mild dissent, however—he says he is not free from doubts. These decisions would, in all probability, have ended a contest as to the construction of this act of assembly, had it not been, that persons not resident in Pennsylvania, could bring their ejectments in the circuit court of the United States. How it happened that a general opinion, for a time prevailed, that the supreme court of the United States (in cases where their jurisdiction was only concurrent with that of the state courts,) was superior to, and controlled the decisions of the state courts, I know not; such, however, was a general opinion among lawyers and judges. It seems to have been the opinion of the supreme court of the United States; and, what, to me, is very strange certainly, was the opinion of Judge Yeates, who, in one case speaks of submitting to it, though he cannot acquiesce in the correctness of it. It is now, for the last twenty years, settled in the supreme court of the United States, that in the construction of acts of the legislatures of the several states, and of titles under those acts, the decision of the supreme court of the state, is to settle the law, and the United States courts hold themselves bound by such decisions.

I shall, therefore, lay Heudekoper and Douglas, 4 *Dall.* 392, out of view. I have endeavoured to show in Campbell *v.* Galbraith, 1 *Watts* 70, that the supreme court of the United States from not being acquainted with our titles, and the difficulties of them, and the decisions on them, were mistaken in supposing the settlement required by the act in question, and the five years residence, and clearing two acres for every hundred, were distinct things. Had they known, after the act of 1786, which defines a settlement to be an actual personal resident settlement, with a manifest intention of making it a place of abode and the means of supporting a family, continue from time to time, &c., had been the subject of discussion, they would have readily seen why, in 1792, the act required an actual settlement, to consist of clearing, fencing, and cultivating at least two acres for every hundred in the tract, erecting thereon a messuage for the habitation of man, and residing or causing a family to reside thereon for five years next following the date of said settlement in order to form a valid actual settlement under that law, and why the act throughout requires and speaks of *such* actual settlement, or *such settlement* and *residence*.

In the cases in 4 *Dall.* above cited, it was settled that the warrantees ought to have a reasonable time within which to make their settlements after the termination of Indian hostilities. In 1 *Binn.* 166, Hazard's Lessee *v.* Lowry, it was settled that this reasonable time should be two years; and in every reported case from that section of the state previous to 1821, when the plaintiff removed, the settler had entered within the two years from Wayne's treaty, made the 22d of December 1795. In Young *v.* Beatty, 1 *Serg. & Rawle* 74, it was decided by all the judges that a settler who entered after the 22d of December, 1797, can prove his actual settlement though he had neither warrant nor application—and of course he might hold the land against a warrant not accompanied with a settlement. The supreme court would not in this case and in Riddle *v.* Albert, 14 *Serg. & Rawle* 341, take up their time in discussing and deciding whether such evidences could be given, and reversing the judgment of the common pleas, in refusing to admit proof of improvements, made by a settler after 1797, unless such proof when admitted would avail a defendant. The case of Campbell *v.* Galbraith was fully considered; it was long under advisement. The Chief Justice and Judge Rogers inclined to one opinion: Judge Ross and myself to a different one. I did not know what would be the opinion of Justice Kennedy when my opinion was written; it was read to Judge Ross; as the opinion of the court, as delivered by Judge Kennedy, agreed with the one I had drawn, mine was not read in court, and would not have been given to the reporter, had it not been urged on me by Judge Ross to publish it. The court below had given an opinion founded on Skeen *v.* Pierce; 7 *Serg. & Rawle* 303. That case, if, as has been said, the defendant entered more than two years after the treaty of December, 1795, contradicted every previous decision. It was fully considered in Campbell *v.*

Galbraith, and Justice Kennedy, to whose opinion I particularly refer,. considers not only the act of the 1st of April, 1792, but all the acts of assembly, viz. the 22d of April 1794—the 22d of September 1794 —the 2d of April 1802; and the 3d of April 1804 (continued by the act of the 28th of March 1806, not noticed in any of our digests) and shows incontestibly, I think, that without totally rejecting the positive enactments of the legislature, we must come to the conclusion at which he arrived in that case. A few pages after, in the same book, 1 *Watts* 121, we find Riddle *v.* Albert. The preceding case had been argued one year before this. This case brought up the same questions on the construction of these several acts. I refer to the opinion in this case, pages 124—5, as condensing the detailed argument of the foregoing case. " When the warrantee has failed within two years after the cause of prevention ceased, to commence or resume his settlement upon the land according to the requisitions of the act, it is perfectly lawful for any person to enter upon, and take possession of the land as a settler, for the condition broken on the part of the warrantee, in not having commenced and persisted in his settlement until it was completed; and so far from a vacating warrant being necessary, in order to justify any one in taking possession of the land, for the purpose of settling and improving it, under the act of 1792, where the original warrantee has failed to do it or have it done within the time required, that the person wishing to take advantage of the forfeiture, must first enter and make his settlement, before he can obtain a vacating warrant, or any warrant. The acts of assembly referred to, have expressly forbidden the issuing of a vacating warrant to any one, unless he has previously become an actual settler on the land, and therefore by irresistible inference have made the entry of any for such purpose, altogether lawful; and put it in his power to take advantage of the condition broken; so that, instead of the state being the first to move in the matter, as has been said, and even decided heretofore, it belongs to the citizens individually to do so, by entering and settling on the land. It also follows, of course, that, if the entry of such settler previously, be not only lawful but indispensably necessary, in order to maintain a vacating warrant, all claim and title to the land, by the original warrantee, must cease and be entirely defeated, immediately on the settler's taking possession of the land and making his settlement. The settler thereby acquires a pre-emption right to the land, which will enable him not only to defend his possession against the original warrantee or any other, but to recover it by action if expelled by him." These cases were fully argued in 1831—2, and the expressions of Judge Yeates already cited, put in stronger language. " Nobody, says Judge Kennedy, ever supposed the warrantees were discharged from the condition of settlement and residence; nor that the legislature had deprived the commonwealth of all remedy to take advantage of the forfeitures in such cases. 1 *Watts* 85.

At the same term with Riddle *v.* Albert, was the case of Rush *v.* Barr, 1 *Watts* 110; where the same principles are explicitly acknowledged. The phraseology is that of the judge who delivered the opinion (that is of myself), but the matters decided are the opinion of the court, who could not have so decided, unless the law was as stated in Campbell *v.* Galbreath. In the same book, page 152, we find the case of Reed *v.* Dickey—this was also decided on the same principle. It is assumed by Judge Rogers that the settlement including the residence and all required by the act of 1792, must be completed or no title vests.

In M'Call *v.* Barnhart, 2 *Watts* 112, (decided the next year, 1833) Judge Rogers, after stating that the plaintiff had shown a patent, adds, " in addition to the evidence already stated, *it was necessary to prove a settlement on the land,*" and goes on to show that the settlement required by the act of 1792 having been made by a person under contract with the plaintiff, was a compliance with the law.

In 1834, we find Reed *v.* Dickey, in 2 *Watts* 462, and the same opinion again given—and from Campbell *v.* Galbreath, until near the close of the term of 1834, I had considered the matter at rest. Sickness had detained me at home until the term was half over—but I found the members of the bar conversing generally on some declarations of some two of the judges, that they did not consider the law as settled by the cases cited. The next year brought up some half dozen cases in which all the decisions except Skeen *v.* Pierce, 7 *Serg. & Rawle* 303, were either not noticed by the presidents of the common pleas, or unceremoniously overruled; and one of them stated the report that some of the judges who decided those causes, had expressed a contrary opinion—these cases were argued and held under advisement. I have only to add that among the reasons for the reversal of the cases cited, were, first, to restore uniformity to our decisions—and secondly. because in publishing the act of April 2, 1802, which is in these words; " In order to prevent the confusion which would arise from issuing different warrants for the same land, and to prevent lawsuits in future respecting grants from the land office, under the act of April 3, 1792, Be it enacted, that from and after the passing of this act, the secretary of the land office shall not grant any new warrant for land which he has reason to believe has been already taken up under a former warrant, but in all such cases he shall cause a duplicate copy of the application to be made on which duplicate copy he shall write his name, and the day and year in which it was presented, and he shall file the original in his office, and deliver the copy to the party applying, provided always, that on every application so to be made and filed, shall be certified on the oath or affirmation of one disinterested witness, that the person making such application, or in whose behalf such application is made, is in actual possession of the land applied for, and such certificate shall mention also the time when such possession was taken, and the application so filed in the secretary's office shall be entitled

v.—3 v

to the same forcet and effec and the same priority in granting warrants to actual settlers, as though the warrants had been granted at the time when the application was filed." The compiler of the digest stopped here—the following words he did not publish: "and should the decision of the court and jury, at the trial aforesaid, be in favour of the claims of the actual settlers, the secretary of the land office shall proceed to grant the warrants, upon the purchase money being paid, according to the priority of the applications filed in his office." How this conclusion of the act can affect the decision given in Campbell v. Galbreath, I cannot discover. The decision was in substance in favour of the settlers—but the opinion of the court was that the act did not run so long as there was actual danger from the enemy, but the warrantee had a reasonable time after the peace, within which to make his actual settlement. And further, "if a person under the pretence of being an actual settler, shall seat himself on lands previously warranted and surveyed within the period allowed under a fair construction of the law, to the warrantee for making his settlement, *withhold the possession* and *obstruct him from making his settlement,* he shall derive no benefit from this unlawful act." Whether Campbell prevented the settlement of Galbreath or the owners of that warrant within the two years, was submitted to the jury. And in every case from Morris v. Neighman to Jones v. Anderson, and to this cause, except Skeen v. Pierce the entry of the actual settler was within the two years from Wayne's treaty. The act of April 3, 1804, superseded the act of 1802, and was even more explicit, and is stated before in citing Riddle v. Albert.

The act of the 1st of March 1811 authorized deputy surveyors to return surveys on actual settlements, and patents to issue to the settler without any warrant having issued to the deputy surveyor either vacating warrant or others.

The act of the 20th of March 1811 was passed with the expectation of closing this contest, and provided that in all cases of interfering claims between warrantees and those who had settled on the land without warrant, the state would yield its claim to the land as against the warrantee, or as the price against the settler, if a compromise according to the terms of that act, reserving its right against both, if they failed to embrace the provisions of that act. That is, if the warrantee conveyed one hundred and fifty acres to the actual settler, the claim of the state to the whole tract as against the warrantee for not settling according to the law should cease, and the claim of the state against the actual settler for the purchase money and interest from the date of the settlement should cease.

The act of the 14th of March 1814 provided, that in every ejectment brought by a warrantee against an actual settler, he should be required to prove to the satisfaction of the court and jury, or arbitrators, that he made the settlement required by the act, or was

prevented by the enemy, and what attempts he made, and how he individually was prevented, and that he persisted in his endeavours for two years.   Now very hard things have been said of this act and the legislature who passed it, and I shall notice this in another case; all those denunciations, however, relate to it as applied to cases where the supposed claims of the parties existed before the enactment of the law; but what objection can be made to it in all cases where the actual settlement is commenced after the date of the law, I have not heard, and until I hear or see them, I shall not answer them.    It is true, the officers of the land office cannot change the terms prescribed by the law; but I have not heard it asserted, nor do I expect to hear it said, that if the act of 1792 required (which it does not) that a vacating warrant should issue before a settlement could be made, on land which a warrantee had neglected to settle, yet the legislature would change this and direct the very reverse, viz. that the actual settlement should precede such warrant; nay more, the State, as such, could not enter; it might authorize one of its officers, or any of its citizens, to enter, or it could legalize such entry, after it was made; such was the opinion of this court in Young *v.* Beaty, 1 *Serg. & Rawle* 74.   "The title being in the commonwealth by default of the warrantee in not complying with the conditions of sale, may be granted to a third person at any time, and it is immaterial to the plaintiff whether it is granted before the entry of the grantee or after."   So I say, if the state could, by law, authorize an entry on land to which it only had any right, it could ratify and render valid one already made.

The warrant of the plaintiff, in this case, was dated in April 1792; no evidence when filed with the deputy surveyor; but surveyed in January 1830, and returned October 1830.   Thus no act was done by the plaintiff for thirty-eight years from the date of the warrant, or thirty-three years from Wayne's treaty.   He had an agent near the ground, but no attempt to make the settlement required, as I say, by the act of 1792; but if that is doubtful, I have cited five acts of assembly which expressly give the defendant a right to settle on the land; and I cannot believe it my duty in this or any other case to disregard the express legislative provisions of the state.   I think the judgment ought to be reversed.