## Reed *against* Dickey.

The purchaser of a title, perfect on its face, for a valuable consideration, takes it discharged of every equity of which he had no notice : but if it be the purchase of an inchoate or defective title, he can claim to be in no better situation than he from whom he purchased.

If he who commences an actual settlement assents to its completion by another, for the use of a third person, and the settlement is so completed, that third person, having procured a warrant, survey and patent, has a perfect title.

ERROR to the common pleas of *Armstrong* county.
The facts of the case are fully stated in the opinion of the court.

*White,* for the plaintiff in error.
The Day tract is the one in dispute.    Campbell was about to leave in 1809.    Templeton bought him out, and took Henry with him to hear and reduce the contract to writing.    Templeton took possession of both tracts, in good faith towards M'Call, and for the purpose of carrying into effect the contract of Campbell.    Templeton, however, did not tell Dickey of the situation in which he stood.    But after Dickey took possession he was informed by Henry of the contract, and became perfectly aware of it.

The court below erred as to the facts.    Dickey having purchased but an equitable interest from Templeton, he was bound to take notice of the latter's situation ; to know his title.    At the time of the purchase the interest was actually disclosed.    But the court below treated Dickey as a purchaser without notice, and upon that point the cause turned.

This court decided that the testimony should have been received

[Reed v. Dickey.]

that was rejected by the court below, and that the covenant of Alexander Campbell ran with the land.   Templeton could only convey his pre-emption right, supposing him to be an actual settler, which was nothing more than an equitable interest.   The purchaser was bound to inquire where the title was.   The very fact of such a purchase implies notice.   There must be a survey in pursuance of the five years residence and settlement.   But here if Dickey even had a survey, it did not complete a legal title, because the actual settler was not bound by it.   Dickey knew that he was purchasing but an equity.   He might have seen that the land was appropriated by a warrant to Nicholas Day.   Dickey's actual settlement was not sufficient to vest the title in him : a survey was necessary.

The deputy surveyor is the judge of the improvement that will authorise the survey.   M'Call's survey was therefore not unofficial. After survey the settler must follow it up, or his survey goes for nothing.   But it is not necessary that the settler should be actually living on the land.   In this case there was a warrant of acceptance, and a contract with an individual to make a settlement.   This gave a valid title to M'Call under the decision of this court.   The actual settler here did not claim for himself.   The purchaser of an equitable title stands in the place of the vendor.   Chew v. Barnett, 11 *Serg. & Rawle* 389.   Dickey was bound to know that by the provisions of the act of 1792 a mere settlement would not give title.   The settlement was made for the benefit of M'Call, not of Templeton.   So that it is not equity against equity, and the rule that prior equity gives right does not hold.   M'Call paid his 80 pounds for the land. The commonwealth cannot receive payment twice ; so that M'Call has more than an equitable right: he has a legal title, consisting of a warrant, survey, and settlement fully completed.   There is no hardship on the defendant.   He might have gone to the surveyor's office, where he could have ascertained where the legal title was, by an inspection of the surveyor's connected diagram, which was notice to all the world.   But he did not use due diligence.   M'Call could go into the common law side of the federal court, and there showing his right of entry, could recover.   Who could call on the commonwealth for the title ?   This is the test.   We answer, none but M'Call, or his assignee the plaintiff.

*Buffington*, for the defendant in error.

Shortly after 1792 a company of land speculators was formed, who adopted the system of making what are called " tomahawk improvements."   It was their plan to get some one to remain on the land a day or two, then call on the deputy surveyor to survey a tract of four hundred acres, and then leave it.   The county surveyor was strongly suspected of being in league with the company.   In Rush v. Barr, 1 *Watts's Rep.* 110, it was decided that a survey not made on a settlement was not good.   Nor was the warrant of acceptance in this case good.   There must be a compliance with the terms of the act of 1792, by an actual settlement and residence.

[Reed v. Dickey.]

The first question below was, whether Dickey was in under M'Call—whether there was any privity of contract? We contend not. It was, however, properly submitted to the jury as a question of fact. Campbell was living on the Bell tract, and Mary Davidson on the Day tract. Campbell, who was her son-in-law, presumed he could contract with M'Call for both. Between Mary Davidson and M'Call there was no pretence of a contract, and whether she afterwards sanctioned the contract made by Campbell was a matter for the jury to determine.

There can be but one legal title to the land. If it be in Dickey, or in Templeton, or in Mary Davidson, it cannot be in M'Call. A survey is not necessary to protect a person in the possession of the land. A settlement and residence for five years, as was the case here, gives a legal title. Mary Davidson sold her right to Templeton. Neither is a warrant necessary to constitute a good title west of the Ohio and Alleghany rivers. Dickey was disconnected from M'Call in the actual settlement. The legal title was in Mary Davidson and not in M'Call, who had nothing but a warrant and survey, which gave no title without an actual settlement. If Mary Davidson had no privity of contract with M'Call, he has not the semblance of a legal title, nor even an equity. The legal title was in Dickey for all potential purposes. The survey was not made a point in the court below. But a survey was not requisite to defend Dickey's possession.

The opinion of the Court was delivered by

Kennedy, J.—This was an action of ejectment brought by the plaintiff in error in the court below, to recover the possession of a tract of land lying in Armstrong county, west of the Alleghany river. He claimed under a warrant of acceptance granted to Archibald M'Call 3d July 1795, who at that time paid the purchase money to the state for the land. The warrant was founded upon a survey of this land made by Stephen Gapin, the deputy surveyor of the district in which it lay, on the 30th of August 1794, for Nicholas Day, as an actual settler under the act of the 3d of April 1792, who transferred his right to M'Call, who afterwards, on the 2d day of July 1817, by his deed, conveyed to the plaintiff. The plaintiff, on the trial, also gave in evidence that Alexander Campbell and Mary Davidson, his mother-in-law, in the year 1799, settled upon two tracts of land claimed by M'Call, and for which he had warrants of acceptance; Alexander Campbell himself, on a tract adjoining the one in dispute, surveyed in the name of John Bell; and on the tract in question he built a cabin for Mary Davidson, into which she moved and was residing in February 1800, when Alexander Campbell, with her knowledge, and without any objection being made by her, came to Pittsburgh for the purpose of making an agreement with Thomas Collins, Esq., the attorney of Archibald M'Call, to continue and complete the settlements commenced by him and his mother-in-law,

[Reed v. Dickey.]

under the warrants of M'Call, and to obtain a certain portion of the land for doing so.

Accordingly an agreement in writing was entered into with Mr Collins, as the attorney of M'Call, by which Campbell bound himself to continue and perfect the settlements commenced upon the two tracts respectively, agreeably to the requirements of the act of the 3d of April 1792, for the use and benefit of M'Call: in consideration whereof, M'Call was to convey to him three hundred acres of the tract on which he was then settled, and which had been surveyed in the name of Bell. These settlements were accordingly completed ; and Mary Davidson, after that she had made the requisite improvements, and completed the residence of five years on the land in question, came to reside on the Bell tract, in a house erected by Campbell for her accommodation, contiguous to his own dwelling.

They both continued afterwards to reside thereon till August 1809, when they sold to Philip Templeton, who was fully apprised of the nature of their interest in the land, and their agreement with M'Call. A duplicate of this agreement, which Campbell held, was delivered over to Templeton, at the same time that Campbell and Mary Davidson conveyed their respective interests in these tracts of land to him. It likewise appeared from the testimony of both Alexander Campbell and Mary Davidson, that, although Mary Davidson had never given any *formal* and *express* authority to Campbell to make the agreement with M'Call or his attorney, for continuing and completing the settlement by her on the land in question, for the benefit and use of M'Call, yet she knew from Alexander Campbell himself, when he was about going to Pittsburgh to obtain it, the purpose for which he was going, and made no objection whatever to his doing so : and again, upon his return, when she was informed by him that he had made an agreement, and was made acquainted with the terms and conditions of it, she never showed, in any way whatever, the slightest dissatisfaction with it. But if any possible doubt could remain, after such evidence, of Mary Davidson's having given her son-in-law, A. Campbell, at least impliedly, full authority to act for and on her behalf, in making the agreement that was made with M'Call's attorney, and of her entire and unqualified approval and satisfaction of it after it was made, and evidence were wanting to remove such doubt; it is to be found in her own testimony, and that of Alexander Campbell, from which it further appears that she, having paid some taxes assessed upon the land in question, obtained a reimbursement of them from M'Call. Now this act, upon her part, is susceptible of but one construction, which is, that she considered the land M'Call's, and that she had made the improvements and settlements upon it for his use and benefit. I consider the law as putting this construction upon it ; and neither she nor those claiming under her will now be permitted to give it a different one. These are the principal and prominent features of the plaintiff's case, as they appeared from the evidence given on the trial ; the credit of which

was not shaken in even the slightest degree by any counter evidence.

On the part of the defendants, it was shown by evidence, that in 1818 or in 1819, Philip Templeton, by parol contract, without writing, sold the land in controversy to Archibald Dickey for 500 dollars, 200 of which were paid in March 1819, and the remaining 300 dollars were to be paid in three annual instalments of 100 dollars each.

It did not appear that Dickey had any knowledge of the agreement made between M'Call and Campbell until after he had paid the first 200 dollars of the purchase money to Templeton, when he was told of it by Stewart Henry. The purchase of the land by Dickey did not appear to have been closed and carried fully into execution until 1825; then Dickey obtained a deed of conveyance for it from Templeton. The defendant also showed that Archibald Dickey, after he contracted for the purchase of the land, extended greatly the clearing and fencing of it: that he put up a log dwellinghouse and kitchen, with stone chimneys therein, besides a double log barn. That his son William also built a dwellinghouse on it, besides a log barn, and that both planted fruit trees, in all perhaps upwards of a hundred.

The counsel for the plaintiff has assigned four errors, all growing out of the charge of the court to the jury, which was excepted to by him: the first and last of which will only be considered; because it appears to me that a correct decision of the question involved in them must remove all difficulty that has been interposed to the plaintiff's recovery.

These two errors relate to a part of the charge of the court which seems to have been delivered in answer to a proposition contended for by the plaintiff's counsel before the jury: that M'Call, by means of the survey, warrant of acceptance, payment of the purchase money to the state, and the completion of the improvement and settlement upon the land made by Mary Davidson, according to the agreement entered into by Campbell for the use of M'Call, became invested with the legal title to it, which he transferred to the plaintiff; that Mary Davidson afterwards had no interest in the land in question, or if she had, it at most was only a bare equity; that Archibald Dickey, in taking a deed of conveyance from Templeton under his conveyance from Mary Davidson, was bound to take notice of the legal title of M'Call or the plaintiff; and that Dickey took the land subject to the plaintiff's right, and could only hold it in the same manner that Mary Davidson held it herself; and that the defendants therefore did not fall within the principle that protects a *bona fide* purchaser for a valuable consideration without notice.

In reply to this proposition thus advanced by the plaintiff's counsel, the court instructed the jury "that the title shown on the part of the plaintiff was not in strictness a complete legal title; that his warrant of acceptance as well as his survey, made, as it would appear, without the colour of authority, did not constitute such a title; that

[Reed v. Dickey.]

the payment of the purchase money gave but an equity against the state, subject to a compliance with the terms of the act of assembly, which required an actual personal resident settlement for the purpose of completing the title ; and that the survey by Gapin, the warrant of acceptance, and the payment of the purchase money, did not, in their opinion, amount to a legal or constructive notice."

The court in their direction to the jury, seem to have lost sight altogether of the fact that the improvement and settlement required by the act of assembly had been made upon the land by Mary Davidson; and that that appearing too, most clearly from the evidence as I have already stated it, to have been completed by her for the benefit of M'Call, he had thereby acquired a legal title, or what at least has been deemed and acted on as such in Pennsylvania.    That M'Call was entitled to a patent for the land from the state immediately after the improvement and settlement of five years were completed by Mary Davidson, upon his paying the patenting fees, and became in contemplation of law invested with the legal title to it, was fully settled by the decision of this court in Rush v. Barr, 1 *Watts's Rep.* 110. The plaintiff in that case was the same as in this, and derived his title from the commonwealth under circumstances precisely similar to the present.    It has been alleged and pretended that the settlement made by Mary Davidson on the land in question, was not made for M'Call but for herself; and it has been attempted, by taking detached parts of the testimony of Mary Davidson and of Alexander Campbell, to show that the jury might very well have found the fact to be so ; but this is not dealing fairly with the testimony.    The whole of what Mary Davidson as well as Alexander Campbell have testified to, must be regarded and taken into consideration in order to determine this matter correctly; and if it be, it is impossible for any jury possessing the least spark of intelligence to entertain a doubt of her acquiescence in, as also her hearty approval and ratification of the agreement made by Campbell with the attorney of M'Call for continuing and completing the improvement and settlement commenced by her on the land for the benefit of M'Call.    And in addition to all this, the circumstance of Mary Davidson never having had a survey made of the land under the authority of her settlement on it, goes still further to show that she considered herself as completing the settlement for M'Call under his survey and warrant of acceptance, otherwise she would have had one made in order to have completed her settlement, under the requisitions of the act of the 3d of April 1792.    A survey for this purpose seems to be necessary; and if practicable, ought to be made by the regular deputy surveyor of the district in which the land lies.    Without such survey being made, for an actual settler under this act, it would seem that in case of his eviction from the land he would have no right to enter, and therefore could not maintain an action of ejectment for the recovery of it. Bond v. Fitzrandolph, 2 *Yeates* 227; Daneson v. Laughlin, 2 *Yeates* 446;  Casby v. Brown, 2 *Binn.* 124; Stockman v. Blair, 5 *Binn.* 211.

[Reed v. Dickey.]

It must be admitted, I think, that the legal title to the land in dispute, on the completion of the settlement, was either still rightly retained by the commonwealth, or that it properly belonged to some individual. But the commonwealth having sold the land, received the whole of the purchase money for it, and the improvement and settlement of five years upon it having been performed, and thus all the conditions of the sale required by her completely fulfilled and discharged, it would seem to follow that she had no right to retain the legal title; but that it of right belonged to the party performing the conditions. By whom then were the conditions of sale in this case performed? It cannot be pretended that they were fulfilled by Mary Davidson; for she barely made the improvement and settlement, and nothing more. She never as much as had a survey made to designate or give notice of the extent of her claim; but having made the settlement for Archibald M'Call, pursuant to the agreement made with him by her son-in-law, A. Campbell, it was unnecessary for her to give herself any concern about having a survey made or procuring a warrant, because these things had all been obtained by Mr M'Call, for whom she was continuing and making the improvement and settlement. The conditions, then, upon which the commonwealth offered the land for sale having been accepted of and fulfilled in every respect by M'Call, he became legally entitled to the patent for it, and he, or his assignee the plaintiff, is therefore to be considered as if he were actually invested with the legal title. This being the case, Archibald Dickey was bound to have known that the commonwealth, when he bought of Templeton, had previously disposed of the land, and to have seen whether Templeton had become invested with the title under such disposition. If he had made such inquiry on that occasion as every man of ordinary caution and prudence is required to do, he would have found that the plaintiff in this case had acquired what is considered in Pennsylvania *quasi* a legal title for the land. For instance, if he had asked Templeton how he had obtained a title for the land, and Templeton had answered, as most likely he did, that he held it by virtue of an improvement and settlement of five years made by Mary Davidson, and a deed of conveyance from her of her right to himself: and Dickey had then inquired further, as certainly it was his duty to have done, whether an official survey had been made or not by the deputy surveyor of the district, and if so, when it was made, and where the boundaries were fixed; and, at the same time, had required the production of a certified copy of it—If he had done this, it is evident that he would have been led to a knowledge of M'Call's survey and warrant of acceptance embracing the land, and upon inquiry of M'Call, would have become fully advised of his title, and that the settlement of Mary Davidson was made for him and constituted a part of his title to the land. So that truly there is not even the semblance of hardship in the application of the rule in this case, that the purchaser of an imperfect title, or rather of no title or

II.—3 I

[Reed v. Dickey.]

interest at all either legal or equitable to the land in this case, is bound to know what title or interest he is buying; and if it be not a title perfect on its face, that ultimately he will get nothing by his purchase. In short, that he buys at his peril : *caveat emptor* is the rule. If Mary Davidson had any interest at all in the land in question after she had completed the settlement for M'Call, I am unable to discover it. She and Campbell were to receive their compensation in land out of the survey made in the name of Bell. The principles and doctrine laid down by the present Chief Justice in Chew v. Barnett, 11 *Serg. & Rawle* 392, are directly applicable to this case; and go to show most distinctly that the purchaser of an inchoate or defective title on its face, cannot claim to be placed in a better situation than the party of whom he purchased. It is only the purchaser of a title perfect on its face for a valuable consideration who takes it discharged from every equity or claim of which he had no notice.

The court, then, ought to have instructed the jury in this case, that if they believed, and from the evidence there certainly could be no doubt of its truth, that Mary Davidson either expressly or impliedly assented to the agreement which her son-in-law, A. Campbell, made with Mr Collins, the attorney of A. M'Call, for continuing and completing the settlement commenced by her upon the land, and that she had accordingly completed the same : it must be considered a settlement made for M'Call, and as if it had been made by himself personally in compliance with the terms on which his warrant of acceptance was granted under the act of the 3d of April 1792; and that he had thereby acquired such a title in law to the land in question as the defendants were bound to take notice of, and that the plaintiff was entitled to their verdict.

Judgment reversed, and a *venire de novo* awarded.