[Meade's Lessee *v.* Haymaker.]

# Lessee of David Meade *against* Frederick Haymaker and Luke Stevens.

David Meade and others under the law of 9th March 1796, are entitled to take out warrants for vacant lands, notwithstanding the acts of 22d April, and 22d Sept. 1794. A precise warrant will take place of an earlier indescriptive one, before survey. It is the duty of a deputy surveyor to return the survey, and his neglect shall not prejudice the party unless in the case of a shifted warrant or application. The draft of a survey by a proper officer is strong evidence that the same was fairly and regularly made; and the presumption will stand till the contrary be proved. Improvements under the act of 30th Dec. 1786, and actual settlements under the law of 3d April 1792, have the same meaning, only the latter defines their extent, &c.

EJECTMENT for one messuage and 400 acres of land, surveyed on a warrant for Henry Meade.

The plaintiff claimed under a warrant to Henry Meade, dated 17th March 1796, for 400 acres north-northwest of Ohio and Allegheny and Conewango creek, between the outlet of Little Coneat lake and Sandy creek, granted in pursuance of the acts of assembly, passed on the 3d April 1792, and 9th March 1796.

This warrant was entered with the district surveyor on the 28th May 1796, and a survey was made thereupon (and seven other warrants) of 401 acres 150 perches, by William Power, on the 15th August 1796, who on the 17th of the same month, received his surveying fees 70 dollars.

A certificate of the receiver general was also shewn in evidence, dated the 7th October 1800, that the warrant granted to the said Henry Meade, with eighteen other warrants, was paid by certificate No. 1, issued to the lessor of the plaintiff, agreeably to the act of 9th March 1796.

*It appeared in evidence, that a survey, corresponding in every particular with that claimed by the plaintiff, had [*68 been made for the defendant Haymaker, under and in pursuance of his improvement, dated 2d October 1794. This survey was said to have been made on the 5th June 1795, and was returned into the surveyor general's office on the 16th January 1798, with a note subjoined thereto, that "David Meade claims this survey "under his warrant." Haymaker lived both before and since 1795 in Cussewago, at a distance from these lands. No proof whatever was given of his having at any time made any improvement on these lands.

Stevens, the other defendant, had a family on the west branch of Susquehannah, under the care of one Jesse Glancey, his stepson. He took lodgings in Cussewago, and aftewards settled and improved a farm about two and a half miles distant from these lands, and which he now holds as an actual settler. Stevens, to make some compensation to Glancey, began a small improvement for him on the lands in question. On the 23d May 1796, he found a cabin erected on the ground, 14 feet square, not covered in; he dressed it for covering, sprouted 30 or 40 stumps, deadened about half an acre, and slept there that night. Next

morning he cut a tree for clapboards, cut a door in the cabin, and went in quest of provisions.   He came back on the 25th May, split the clapboards, covered in the cabin, and slept again there. On the succeeding day he returned to Cussewago, and on the 2d June he worked three days on the lands in controversy, clearing about half an acre, by grubbing, topping, heaping and burning brush wood, and slept there during that period.   In the month following he again worked on the land, and cut logs, poles and brush, in order to sow rye, and planted two quarts of potatoes.

Jesse Glancey crossed the Ohio the latter end of May 1797, entered into an agreement with Haymaker, and now cultivates the land.

Mr. Ross for the defendants, contended that the plaintiff's warrant was not authorized by the acts of 3d April 1792, or 9th March 1796, or any other law.   Running warrants are not recognized by the act of 3d April 1792.   They cannot operate as notice, according to the words of the 4th section, (3 St. Laws 210,) "in order that all persons who may apply for lands may "be duly informed thereof."   The 3d section directs, that "eve- "ry application shall contain a particular description of the lands "applied for."   But this is not the case as to the present warrant, which calls for no specific spot, but generally for lands between *the outlet of Little Coneat Lake and Sandy Creek.   The intermediate space between them is a large tract of country.

The act of 9th March 1796, (4 St. Laws 16,) "to compensate "David Meade and others," makes no alteration herein, but puts them on the same footing with other citizens.   It barely gives them credit for the sums found due to them, either in taking out new warrants or paying arrearages on former grants ; and they must necessarily be considered as subjected to every other regulation, form and condition imposed by existing laws. The warrant on the face of it expresses no condition of improvement, building a house, or residence for five years.

The survey also under which the plaintiff claims, has never been returned into the surveyor general's office, as the law requires.   It is a mere transcript of the survey made for Haymaker on the 5th June 1795, and it is highly probable that it was not made by the deputy surveyors going on the land, after the issuing of the warrant.   This is peremptorily required by the act of 8th April 1785, and by the 9th section thereof, (2 St. Laws 316,) "every survey theretofore made is accounted clan- "destine, void, and of no effect whatever."   It is not made voidable, but *ipso facto* a nullity.

Another ground of defence presents itself.   Under the act of 22d April 1794, (3 St. Laws 581,) no warrant shall issue after the 15th June then next for any lands in the new purchase, except in favour of persons claiming the same by virtue of some settlement and improvement.   This law is not to be defeated

[Meade's Lessee _v._ Haymaker.]

by implication ; and considering its provisions as subsisting, it is evident that the lessor of the plaintiff should have made a settlement and improvement before his warrant could regularly and legally issue.

Besides, the last clause in this act provides, that "no warrants, "·except those wherein the land is particularly described, shall "affect the title or claim of any person, having made an actual "improvement, before such warrant is entered and surveyed in "the deputy surveyor's books." The word settlement is omitted.

Admitting that none but actual settlements are protected by the act of 3d April 1792, still as to warrants issued and located after the 15th June 1794, they shall not take place of mere im-provements. It cannot be denied, that if the plaintiff's warrant is legal, it describes no certain place, and Stevens had begun an improvement for Glancey, his step-son, who may be considered as one of his family, and had slept at least five nights on the land ; consequently the plaintiff is not entitled to recover.

*By THE COURT. Several exceptions, plausible in [*70 themselves, having been taken against the plaintiff's right, it becomes the duty of the court to examine them minutely. The public are materially interested in the establishment of certain principles regulating the titles of landed property ; on the correct application of those principles to the different cases which may occur, the peace and safety of society must depend.

The act of 9th March 1796, "to compensate David Meade "and others," was grounded on this conformity to the provisions of the law, passed on the 28th March 1787. (Loose Laws 270.) "They had performed on their part, all the requisites necessary "to their obtaining the benefits of the said law ; and it was but "just, that the persons complying with the terms of the law "aforesaid, while the law was in existence, should be entitled "to the benefits of the same." By the 9th section of the for-mer law, the claimants under Pennsylvania rights were to be allowed an equivalent for their claims, either in the old or new purchases, at their option ; and "warrants and patents, and all other acts of "the public offices relating thereto, were to be "performed free of expence." Possessed of these meritorious claims, they are allowed by the law of 9th March 1796, to have a credit in the books of the receiver general for the sums justly found due to them, either in "taking out new warrants in any "part of the state where vacant land might be found, or paying "arrearages on former grants." To effectuate the declared in-tentions of the legislature, and preserve the stipulated public faith inviolate, these persons must necessarily be entitled to new warrants, notwithstanding the general expressions in the former acts of 22d April 1794, or its supplement of the 22d September 1794, (3 St. Laws 636,) where the lands were not previously improved. No certificates of judges or justices were necessary in the case of other citizens applying for warrants for lands,

3 YEATES—5

[Meade's Lessee *v.* Haymaker.]

lying north and west of the rivers Ohio and Allegheny, and Conewango creek, and therefore were not to be exacted from this class of public creditors; but every condition of improvement, building a house and five years residence, and every other regulation were equally binding on them as others.

But it has been objected, that the warrant of Henry Meade is indescriptive of any particular place, and wants precision. It is answered, that it is reduced to certainty by the survey. The effect of the loose wording thereof might have been, that if a subsequent warrant had come to the hands of the deputy surveyor, especially describing a particular spot between the outlet of Little Coneat Lake and Sandy Creek, before a survey has been *made on this indeterminate warrant, it would have been postponed thereby.

*71]

As to the survey not having been returned, it was the fault of the district surveyor, who had received his legal fees, and shall not prejudice the party, in any other case than that of a shifted application or warrant. Such have been our uniform decisions.

Every presumption is in favour of a draft of survey duly certified by the proper officer. It is powerful evidence, that a survey was fairly, regularly, and legally made, unless it is rebutted by other proof. The security of landed titles rests greatly on this rule, and it would be dangerous in the extreme to shake it. No testimony has been adduced to shew that this survey was not made by the deputy surveyor going on the ground, and therefore the presumption stands in its favour.

Much reliance has been placed on the last clause of the law of 22d April 1794. It is certainly penned very incorrectly. It might at first be supposed to imply, that warrants particularly descriptive might affect the equitable claims of previous *bona fide* improvers of the same lands. But it will scarcely be contended, that this could have been the real intention of the legislature, considering the different expressions of the public will, in a variety of acts, since the revolution, on the subject of improvement rights. In the preceding part of the section, the words settlement and improvement seem ranked as synonymous expressions, though the latter word only is inserted in the close of the law. In fact, an improvement, as defined by the act of 30th December 1786, 2 St. Laws, 488, has the same meaning, as an actual settlement under the act of 3d April 1792, Addis. 335, except that the latter points out precisely the extent of it, by clearing 2 acres for each 100, erecting a messuage, and residing thereon five years. The former law describes an improvement "as an actual, personal, resident settlement, with a "manifest intention of making it a place of abode, and con-"tinued from time to time, unless interrupted by the enemy," &c. We are however of opinion, that if a doubt could be supposed to arise under the expressions of the act of the 22d April 1794, they are removed by the supplement thereto, passed at the next sessions, on the 22d September, 3 St. Laws, 636,

[Gratz' Lessee *v.* Campbell.]

which in several instances alters and supercedes the provisions of the first act, and secures settlements and improvements made under the law passed 3d April 1792.

How then stand the pretensions of either of the defendants? Though Haymaker had a survey made for him, he had no settlement whereon to ground it; and therefore it is a mere nullity, and gives no right whatever.

Stevens began to make what has been styled an improvement, *three days before the plaintiff's warrant was entered with the district surveyor. But he had an actual settlement, 2½ miles distant, whereon he resided, and which he now holds, as an actual settler. He could not have two resident settlements, two homes at the same moment. If he could secure the title of more than one place by actual settlement, wealthy men might do the same thing to any extent, and the poor would thus be prevented from all means of obtaining land, which could never have been intended. [*72

Glancey can derive no claim under either Haymaker or Stevens; he himself did not cross the Ohio, until the latter end of 1797, more than nine months after the survey.

On the whole therefore, the result is, that the plaintiff has the only right recognized by the law, and we are clearly of opinion, that he is entitled to recover.

Verdict for the plaintiff.

Messrs. Sample and Collins *pro quer.*

Cited in 3 Yeates 277 to show that actual settlements were requisite in the case of warrants issued under the Act of March 9, 1796.
Cited W. & S. 75.
Cited in 59 Pa. 164 in support of the proposition that every presumption is in favor of a draft of survey duly certified by the proper officer.
Referred to in 1 S. & R. 523.